JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

**(b)** County of Residence of First Listed Plaintiff    McLean, IL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Katten Muchin Rosenman LLP 525 West Monroe St. Suite 1900, Chicago, IL 60661
(312) 902-5200
Miller Canfield 840 West Long Lake Rd. Suite 150, Troy, MI 48098 (248) 267-3381

## DEFENDANTS

SAM HAKKI, M.D. a/k/a SAM HACKETTE, et al.

County of Residence of First Listed Defendant    Macomb, Michigan
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [X] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [X] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | | | | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. 1962 (c) and 18 U.S.C. 1962(d)
Brief description of cause:
Lawsuit for RICO violations, fraud, and unjust enrichment

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ 1,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
August 20, 2021

SIGNATURE OF ATTORNEY OF RECORD
*/s/ Caroline B. Giordano (P76658)*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

PURSUANT TO LOCAL RULE 83.11

1.　　　　Is this a case that has been previously dismissed?　　　☐ Yes
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　■ No

　If yes, give the following information:

　Court: _____

　Case No.: _____

　Judge: _____


2.　　　　Other than stated above, are there any pending or previously
　　　　discontinued or dismissed companion cases in this or any other　　☐ Yes
　　　　court, including state court? (Companion cases are matters in which　■ No
　　　　it appears substantially similar evidence will be offered or the same
　　　　or related parties are present and the cases arise out of the same
　　　　transaction or occurrence.)

　If yes, give the following information:

　Court: _____

　Case No.: _____

　Judge: _____


Notes :

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
--------------------------------------------------------x
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

      Plaintiff,

v.

                                        **DEMAND FOR JURY TRIAL**

SAM HAKKI, M.D. A/K/A SAM HACKETTE,
STAR PAIN MANAGEMENT & REHAB LLC,
NEXTGEN PAIN ASSOCIATES & REHABILITATION LLC,
ADVANCED CENTRAL LABORATORY, LLC,
MIDWEST MEDICAL LAB LLC,
FUTURE DIAGNOSTIC CENTER LLC,
NABIL BEYDOUN A/K/A NABIL BAYDOUN A/K/A BILL BAYDOUN,
ABDUL BEYDOUN A/K/A ABDUL BAYDOUN A/K/A ABE BAYDOUN,
FOUAD BEYDOUN A/K/A FOUAD BAYDOUN A/K/A FRANK BAYDOUN,
ANWAR BAKER,
MUNA AFAN,
MOHAMED EL-FAKHARANY, M.D.,
RIAD GEORGE KHOURY, M.D.,
VINOD SHARMA, M.D. and
HORST GRIESSER, M.D.,


      Defendants.
--------------------------------------------------------x

## <u>COMPLAINT</u>

      State Farm Mutual Automobile Insurance Company ("State Farm Mutual"),

for its complaint against defendants Star Pain Management & Rehab LLC ("Star

Pain"), NextGen Pain Associates & Rehabilitation LLC ("NextGen"), Advanced

Central Laboratory, LLC ("Advanced Central Labs"), Midwest Medical Lab LLC

("MML"), Future Diagnostic Center LLC ("Future Diagnostic"), Nabil Beydoun a/k/a Nabil Baydoun a/k/a Bill Baydoun ("Nabil Baydoun"), Abdul Beydoun a/k/a Abdul Baydoun a/k/a Abe Baydoun ("Abdul Baydoun"), Fouad Beydoun a/k/a Fouad Baydoun a/k/a Frank Baydoun ("Fouad Baydoun"), Sam Hakki, M.D. a/k/a Sam Hackette ("Hakki"), Muna Afan ("Afan"), Anwar Baker ("Baker"), Riad George Khoury, M.D. ("Khoury"), Vinod Sharma ("Sharma"), Horst Griesser, M.D. ("Griesser"), and Mohamed El-Fakharany, M.D. ("El-Fakharany") (collectively, "Defendants"), alleges as follows:

## I.     NATURE OF THE ACTION

1.      This action involves Defendants' scheme to fraudulently obtain money from State Farm Mutual by submitting, or causing to be submitted, bills and supporting documentation for medically unnecessary and fraudulent toxicology testing purportedly rendered to individuals ("patients") who have been in automobile accidents and are eligible for personal injury protection benefits ("No-Fault Benefits") under State Farm Mutual policies when, in fact, the services were performed regardless of whether they may be medically necessary.  Instead, the services, if performed at all, are performed pursuant to a predetermined protocol that enriches the Defendants, without regard to whether the services may actually be necessary to address the unique needs of any patient.

2.     The scheme is principally driven by Fouad Baydoun, Nabil Baydoun, Abdul Baydoun, Hakki, Afan, and Baker ("the Management Group") but each defendant has a critical role in the scheme.  Fouad Baydoun, Nabil Baydoun, Abdul Baydoun, Hakki, and Afan own and/or control Computerised Joint, Mini Invasive, Star Pain, and NextGen ("the Clinics"), which are medical practices in Michigan that purport to provide pain management services.  Hakki formed Advanced Central Labs with Baker at approximately the same time he formed Computerised Joint and Mini Invasive in Michigan, which he created to provide a steady patient stream to Advanced Central Labs.  In fact, from 2016 until March 2017, Advanced Central Labs was effectively Hakki's captive laboratory, relying on Hakki (or other physicians at his clinics) for approximately 99% of its patients.

3.     To further maximize the profits at Advanced Central Labs, Hakki expanded its referral base through his relationships with Fouad Baydoun, as well as Fouad Baydoun's cousin, Nabil Baydoun, and Abdul Baydoun.  Like Hakki, Nabil Baydoun, Abdul Baydoun, and Fouad Baydoun created two purported pain management clinics, Star Pain and NextGen, to provide Advanced Central Labs with an additional stream of patients.  Afan, who was the office manager at Hakki's Computerised Joint, became a co-owner of Star Pain and responsible for its day-to-day operations.  Once Star Pain and NextGen started referring patients to Advanced Central Labs, it effectively became the laboratory for the Clinics, with

3

approximately 90% of Advanced Central Labs' patients coming from the Clinics. Advanced Central Labs essentially was an outgrowth of the Clinics, designed to generate the fraudulent toxicology tests and bills for the Clinics.

4.     Importantly, through their ownership and/or control of the Clinics, Nabil Baydoun, Abdul Baydoun, Fouad Baydoun, Hakki, and Afan implemented a treatment protocol designed to funnel patients for medically unnecessary urine drug tests ("UDTs") at labs owned and/or controlled by members of the Management Group, namely defendants Advanced Central Labs, MML once it took over the operations of Advanced Central Labs, and Future Diagnostic once it took over operations of MML ("the Controlled Labs").

5.     Because most of the members of the Management Group are not licensed medical providers and therefore cannot lawfully treat patients and make referrals for UDTs, the Management Group recruited licensed physicians, including defendants Griesser, Sharma, and Khoury, to provide medical evaluations at the Clinics that served as a pretext for the medically unnecessary UDTs.

6.     Specifically, the physicians who saw patients at the Clinics ("the Physicians"), including Hakki, Griesser Sharma, and Khoury, purported to legitimately examine and diagnose patients.  But these evaluations were not legitimate.  Rather than providing individualized care to the patients, the Physicians referred patients to the Controlled Labs for UDTs as a matter of course, without

4

regard to whether the UDTs were medically necessary. In fact, both Griesser and Khoury testified that their UDT referrals were not based on their own independent medical judgment but rather were made at the behest of Nabil Baydoun, Abdul Baydoun, and Fouad Baydoun, even though these individuals are not licensed medical professionals and could not lawfully direct medical providers to order such medical tests.

7. To further maximize profits, Defendants ensured the UDT referrals were for extensive panels of drugs, without any consideration of whether testing for all of the drugs or *any* of the drugs was medically necessary based on the particular patient's medical needs. For instance, the panels ordered by the Physicians typically consisted of more than 20 separate substances. Defendants, and in particular Hakki, Baker, and Fouad Baydoun, had financial incentives to order excessive and broad drug panels: the Controlled Labs billed separately for each drug on the panel, leading to extraordinary global charges to State Farm Mutual of typically amounts in excess of $3,000-$4,000 for ***each*** date of service for each patient. Moreover, as described below, Defendants ordered these excessive drug panels consistently on virtually every separate visit for each patient, whether or not they were needed. Thus, total toxicology charges for a single patient often exceeded $20,000.

8.      Importantly, the Physicians did not use the results of the UDTs to evaluate patient care.  As a consequence, the Physicians did not integrate the results of the UDTs in the patients' treatment and routinely ignored "red flag" results that indicated the patient was not using prescribed drugs or was using drugs that were illegal or not prescribed.

9.      In fact, the UDT reports generated by the Controlled Labs regularly yielded ***physiologically impossible*** results, which should have been obvious to any medical provider that cared about the test results.  But because the Physicians simply ordered these UDTs on command and had no intention of using the test results to guide any patient's medical care, they did not even acknowledge these impossible results.  Instead, they continued referring patients for UDTs at the Controlled Labs, even though the test results themselves should have alerted the Physicians that something was amiss with these UDT results.

10.     These physiologically impossible results were also ignored by defendants Baker and El-Fakharany, who each played key roles in enabling the Controlled Labs to function because they, like the other Defendants, knew these UDTs were not being ordered to guide the clinical care of the patients.  Specifically, in addition to owning and managing the Controlled Labs, Baker was the lead toxicologist and ran the tests at the Controlled Labs.  His initials often appear next

6

to the results on the UDT reports, including reports with physiologically impossible results.

11.     Meanwhile, El-Fakharany, the lab director at Advanced Central Labs, was critical to enabling the Controlled Labs to obtain licenses to operate.  Under federal law, the Controlled Labs were required to have a lab director who met federally mandated criteria in order to obtain their license to operate as a lab. Because none of the members of the Management Group met these requirements, they needed to recruit qualified medical professionals.  The Management Group recruited El-Fakharany, who was identified as the lab director on the certification application for Advanced Central Labs, and then recruited other lab directors for MML and Future Diagnostic.  Without the participation of qualified lab directors, the Controlled Labs could not obtain their lab certifications and would not have been able to submit charges for the confirmatory UDTs.  As described below, the frequent presence of physiologically impossible results produced by the Controlled Labs demonstrates neither Baker nor El-Fakharany were monitoring the integrity of the lab testing, or, if they were monitoring, they simply did not care about how testing was conducted.

12.     Because the orders for the UDTs billed by the Controlled Labs were not individually tailored to the patients' unique medical needs but rather were requested solely to enrich Defendants, the bills and supporting documentation

submitted to State Farm Mutual for those services were fraudulent and State Farm Mutual did not owe the charges for those services.

13.     This action seeks a declaratory judgment that State Farm Mutual is not liable for any pending bills or bills the Controlled Labs submitted, and caused to be submitted, to date and through the trial of this case based upon the above-described conduct.  This action also asserts statutory claims under 18 U.S.C. §§ 1962(c) and (d) ("RICO") as well as common law claims for fraud and unjust enrichment, to recover actual damages of more than $1 million in No-Fault Benefits paid to Defendants, plus treble damages and costs, including reasonable attorneys' fees.

14.     State Farm Mutual has not been reimbursed by the Michigan Assigned Claims Facility, the Michigan Catastrophic Claims Association, or any other source for any of the charges at issue in this case.

## II.     JURISDICTION AND VENUE

15.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 *et seq*. because they arise under the laws of the United States.   Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over the remaining claims because they are so related to

the RICO claims over which it has original jurisdiction they form part of the same case or controversy.

16.     Pursuant to 28 U.S.C. § 1332(a)(1), this Court independently has jurisdiction over all claims because the matters in controversy exceed the sum or value of $75,000, exclusive of interest and costs, and are between citizens of different states.

17.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district because this is the jurisdiction where Defendants reside, and a substantial part of the events or omissions that gave rise to the claims occurred here.

## III.   PARTIES

### A.    Plaintiff

18.     State Farm Mutual is a citizen of Illinois.  It is a corporation organized under the laws of Illinois, with its principal place of business in Bloomington, Illinois.  At all relevant times, it was licensed in Michigan to engage in the business of insurance.

### B.    Defendants

#### 1.    The Clinic Defendants

##### a)    The Baydoun Clinics

###### (1)    Star Pain

19.     On February 24, 2017, Nabil Baydoun, Fouad Baydoun, and Afan

formed Star Pain Management & Rehab LLC in Michigan as a limited liability company.

20.    Its principal place of business is at 27483 Dequindre Road, Madison Heights, Michigan 48071.

21.    Nabil Baydoun, Fouad Baydoun, and Afan are the sole owners and members of Star Pain.  Because Nabil Baydoun, Fouad Baydoun, and Afan are citizens of Michigan, Star Pain is a citizen of Michigan.

### (2)    NextGen

22.    Four days after Star Pain was formed, on February 28, 2017, Abdul Baydoun and his wife Nura Kutob formed NextGen Pain Associates & Rehabilitation LLC as a limited liability company.

23.    Its principal place of business is at 13530 Michigan Ave., Dearborn, Michigan 48126.

24.    Abdul Baydoun and his wife Nura Kutob are the sole owners and members of NextGen.  Because Abdul Baydoun and his wife Nura Kutob are citizens of Michigan, NextGen is a citizen of Michigan.

### (3)    Baydoun Successor Clinics

25.    In 2019, defendant Afan and the Baydoun defendants separated ways. As a result, Star Pain and NextGen closed and began operating under new names.

26.     Specifically, in July 2019, Afan and defendant Dr. Khoury, Star Pain's primary treating physician, ended their relationship with Star Pain and the Baydouns and formed a new clinic, Comprehensive Care Pain Management, P.C. ("CC Pain").  The NPI filings identify Afan as "President."  Khoury testified he is the purported owner of CC Pain and Afan "is managing the business" and Afan's staffing company provides all of the staff and employees.[1]

27.     As for the Baydouns, they formed at least three "new" clinics – Care Recovery Clinic PLLC ("Care Recovery"), Metro Med Pain Management & Rehab PLC ("Metro Med"), and Central Health Institute Center of Michigan LLC/Heights Pain Management & Rehab PLC ("Heights Pain") (collectively, the "Baydoun Successor Clinics").  These Successor Clinics continued playing the same role in the fraud scheme, including purporting to provide medical evaluations that served

---

[1] Khoury declined to explain why he terminated his relationship with Star Pain and the Baydouns, simply responding "That's personal."  However, lawsuits between Afan and Nabil and Fouad Baydoun, which were filed in Michigan state court in the fall of 2019, indicated why they separated ways.  Specifically, Nabil's lawsuit against Afan alleges while Nabil, Fouad, and Afan each held a one-third ownership interest in Star Pain, "the parties' business relationship slowly began to deteriorate" and the Baydouns voted to dissolve Star Pain.  According to the Baydouns, Afan refused to comply with the dissolution and instead opened up her own separate clinic, CC Pain, and began directing Star Pain patients to her clinic.  For her part, Afan's countersuit accuses the Baydouns of falsifying Star Pain's financial records "to disguise their various financial improprieties and misappropriations," which included "misappropriating cash and other assets of [Star Pain] through various schemes of artifice, fraud, and other unlawful conduct."  The two lawsuits between Afan and the Baydouns are still pending and appear to be in the midst of discovery.

11

as a pretext to refer patients to the Controlled Labs for medically unnecessary UDTs as a matter of course.

28.    Specifically, NextGen morphed into Care Recovery Clinic PLLC ("Care Recovery") and subsequently into Metro Med Pain Management & Rehab PLC ("Metro Med").  Defendant Griesser was the primary treating physician at NextGen until late April 2019, when he began working at Care Recovery in early May, which is located "in the same building" and at which "[p]robably 50 percent" of NextGen's patients just continued their treatment.  Care Recovery and NextGen also shared the same phone number.  In addition, around the same time, Care Recovery submitted notices to State Farm Mutual stating:  "PLEASE NOTE FORMER NAME OF COMPANY WAS NEXTGEN PAIN ASSOCIATES." (emphasis in original).  In November 2019, Griesser switched over to Metro Med, which Griesser testified has the same owners as Care Recovery and essentially was the direct successor to Care Recovery.  "Ali Baydoun" – Nabil Baydoun's son – is the sole person identified on Metro Med's corporate filings.

29.    In addition, in late March 2019, Nabil Baydoun also formed another entity, Heights Pain, for which NPI filings identify him as its sole "Member."

30.    As addressed below in more detail, the Baydoun Defendants owned and/or controlled the Baydoun Successor Clinics – Care Recovery, Metro Med and

Heights Pain – for the purpose of continuing their scheme to funnel their patients to the Controlled Labs for medically unnecessary UDTs.

### 2. The Toxicology Companies

### (1) Advanced Central Labs

31. On November 9, 2015, Hakki, under the name "Sam Hackette," formed Advanced Central Labs in Florida with defendant Baker, as well as two other associates, Mouneer Owen and Samir Itani. The Articles of Organization identify Hakki (listed as "Sam Hackette"), Baker, and Owen as Managers, and Hakki's wife, Mona Thamer, as its registered agent.

32. On February 6, 2017, Advanced Central Labs filed its Application for Certificate of Authority to Transact Business In Michigan. Its principal place of business is at 4619 Allen Road, Allen Park, Michigan 48101.

33. Mouneer Owen and Baker are the sole members of Advanced Central Labs. Because Mouneer Owen and Baker are citizens of Michigan, Advanced Central Labs is a citizen of Michigan.

34. Defendants have taken several steps to conceal Hakki's ownership and/or control of Advanced Central Labs. Specifically, Hakki's name was removed from Advanced Central Labs's Florida corporate filings in January 2016, and his name was omitted altogether in its Michigan corporate filing.

35.     Advanced Central Labs submitted charges for presumptive and confirmatory UDTs from patients of Computerised Joint, Mini Invasive, Star Pain, and NextGen, pursuant to referrals from the Physicians.  Collectively, the Clinics provided Advanced Central Labs with the vast majority of its patients.  In fact, between February 2016 and March 2017, Hakki (or other physicians at his clinics) were responsible for 99% of the referrals to Advanced Central Labs.

36.     Baker was the lead toxicologist at Advanced Central Labs and ran the tests.

37.     El-Fakharany was the lab director of Advanced Central Labs.

38.     From approximately February 2016 until at least March 2018, Advanced Central Labs knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent for more than 1,000 UDTs.  *See* Ex. 1.  These bills and the supporting documentation were fraudulent and were not owed because these services were not medically necessary, and were performed pursuant to the predetermined protocol developed before the patient's initial consultation at the medical office ("the Predetermined Protocol").  The services rendered were fraudulent because they were not rendered in response to the unique presenting condition of each patient, but were rendered to conform to the Predetermined Protocol without regard to the condition of each patient.

14

### (2)      Midwest Medical Lab

39.      On July 24, 2017, Fouad Baydoun formed Midwest Medical Lab LLC in Michigan.

40.      Fouad Baydoun has been the sole owner and member of MML. Because Fouad Baydoun is a citizen of Michigan, MML is a citizen of Michigan.

41.      Its principal place of business is at 1916 N Reynolds Road, Toledo, Ohio 43615.

42.      MML submitted charges for presumptive and confirmatory UDTs from patients of Star Pain and NextGen, pursuant to referrals from the Physicians. Collectively, Star Pain and NextGen provided MML with the vast majority of its patients.

43.      Baker was the lead toxicologist at MML and ran the tests.

44.      From approximately January 2018 until at least April 2019, MML knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent for more than 900 UDTs.  *See* Ex. 2.  These bills and the supporting documentation were fraudulent and were not owed because these services were not medically necessary, and were performed pursuant to the Predetermined Protocol developed before the patient's initial consultation at the medical office.  The services rendered were fraudulent because they were not rendered in response to the unique presenting condition of each patient, but were

rendered to conform to the Predetermined Protocol without regard to the condition of each patient.

### (3)    Future Diagnostic Center

45.     On July 30, 2018, Anwar Baker formed Future Diagnostic Center LLC.

46.     Future Diagnostic's principal place of business is at 4619 Allen Road, Allen Park, Michigan, the same address Advanced Central Labs used in Michigan.

47.     Baker is identified as the "Owner" on Future Diagnostic's NPI filings, and as the organizer and initial resident agent on its corporate filings with the state of Michigan.  Baker is also the lead toxicologist at Future Diagnostic and ran the tests.

48.     Mouneer Owen – who formed Advanced Central Labs in Florida with Hakki and Baker and was an owner of Advanced Central Labs – is listed as a "Member" (owner) and the current resident agent on Future Diagnostic's corporate filings.

49.     Baker and Mouneer Owen are identified on public filings as the sole members of Future Diagnostic.  Because Baker and Owen are citizens of Michigan, Future Diagnostic is a citizen of Michigan.

50.     Future Diagnostic submitted charges for presumptive and confirmatory UDTs from patients of Star Pain and NextGen, as well as the Baydoun

16

Successor Clinics (Care Recovery, Metro Med, and Heights Pain), pursuant to referrals from the Physicians.  Collectively, Star Pain, NextGen, and the Baydoun Successor Clinics provided Future Diagnostic with the vast majority of its patients.

51.    From approximately March 2019 until at least March 2020, Future Diagnostic knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent for approximately 200 UDTs.  *See* Ex. 3.  These bills and supporting documentation were fraudulent and were not owed because these services were not medically necessary, and were performed pursuant to the predetermined protocol developed before the patient's initial consultation at the medical office.  The services rendered were fraudulent because they were not rendered in response to the unique presenting condition of each patient, but were rendered to conform to the Predetermined Protocol without regard to the condition of each patient.

### (4)    Successor Baydoun Toxicology Lab, iNova

52.    After defendant Afan and the Baydoun defendants separated ways and the Baydouns formed the Baydoun Successor Clinics, the Baydouns began operating yet another lab – iNova Diagnostics, LLC ("iNova") – and once again took steps to conceal their ownership and/or control of this new lab.

17

53.     Beginning in May 2020 – and despite iNova's Florida location – iNova began receiving all of the UDT referrals from the Baydoun Successor Clinics (Care Recovery, Metro Med, and Heights Pain), all of which are located in Michigan.

54.     To conceal the Baydouns' ownership and control, the corporate paperwork and NPI filings for iNova list its sole "Owner," Manager and registered agent as "Jenna Zardus," a 22-year-old.  Zardus is the daughter of the owner of the billing company that billed for Advanced Central Labs and MML, who also served as MML's registered agent and whose name is listed across the top of NextGen's corporate filings.

55.     However, during a deposition on January 19, 2021, iNova's lab director testified under oath that iNova was in fact owned by Frank Baydoun and Nabil Baydoun.

56.     As of the filing of this complaint, the Baydoun Successor Clinics continue to refer virtually all of their UDTs to iNova.  Moreover, the Baydoun Successor Clinics have provided iNova with the vast majority of its patients.

### 3.      The Management Group

#### a)      Sam Hakki

57.     Sam Hakki a/k/a Sam Hackette is a resident and citizen of the state of Michigan.

58.     Hakki has been a licensed physician in Michigan since 2013.

59.     To facilitate the Defendants' scheme, Hakki owned and/or controlled a network of pain clinics and secretly owned or controlled a UDT laboratory in Michigan, including Computerised Joint, Mini Invasive, and Advanced Central Labs, targeting patients who have been in auto accidents and are eligible for No-Fault Benefits.

60.     Through his ownership and/or control of Computerised Joint, Mini Invasive, and Advanced Central Labs, Hakki directed their activities, including instructing the Physicians to make UDT referrals, thereby facilitating the Predetermined Protocol.

61.     From at least February 2016 through at least March 2018, Hakki knowingly submitted, and/or caused to be submitted, bills and supporting documentation that are fraudulent from Advanced Central Labs for UDTs performed on patients of Computerised Joint and Mini Invasive. *See* Ex. 1.

### b)     Nabil Baydoun

62.     Nabil Baydoun a/k/a Bill Baydoun is a resident and citizen of the state of Michigan.

63.     Nabil Baydoun is not a licensed physician and holds no medical license in Michigan.

64.     To facilitate the Defendants' scheme, Nabil Baydoun owns and manages Star Pain and Heights Pain, as well Care Recovery and Metro Med, which

target patients who have been in auto accidents and are eligible for No-Fault Benefits.

65.     Through his ownership and/or control of Star Pain, Heights Pain, Care Recovery and Metro Med, Nabil Baydoun has directed their activities, including instructing the Physicians to make UDT referrals, thereby facilitating the Predetermined Protocol.

66.     From at least February 2017 through at least March 2018, Nabil Baydoun knowingly submitted, and/or caused to be submitted, bills and supporting documentation that are fraudulent from Advanced Central Labs for UDTs performed on patients of Star Pain.  *See* Ex. 1.

67.     From at least January 2018 through at least April 2019, Nabil Baydoun knowingly submitted, and/or caused to be submitted, bills and supporting documentation that are fraudulent from MML for UDTs performed on patients of Star Pain.  *See* Ex. 2.

68.     From at least March 2019 through at least March 2020, Nabil Baydoun knowingly submitted, and/or caused to be submitted, bills and supporting documentation that are fraudulent from Future Diagnostic for UDTs performed on patients of Star Pain, NextGen, Heights Pain, Care Recovery and Metro Med.  *See* Ex. 3.

c)      **Fouad Baydoun**

69.     Fouad Baydoun a/k/a Frank Baydoun is a resident and citizen of the state of Michigan.

70.     Fouad Baydoun is not a licensed physician and holds no medical license in Michigan.

71.     To facilitate the Defendants' scheme, Fouad Baydoun owns and/or controls Star Pain, Care Recovery, and Metro Med, as well as UDT laboratories in Michigan and Ohio, including Advanced Central Labs, MML, and Future Diagnostic, targeting patients who have been in auto accidents and are eligible for No-Fault Benefits.

72.     Through his ownership and/or control of Star Pain, Care Recovery, Metro Med and the UDT laboratories, Fouad Baydoun directed their activities, including instructing the Physicians to make UDT referrals, thereby facilitating the Predetermined Protocol.

73.     From at least February 2017 through at least March 2018, Fouad Baydoun knowingly submitted, and/or caused to be submitted, bills and supporting documentation that are fraudulent from Advanced Central Labs for UDTs performed on patients of Star Pain.  *See* Ex. 1.

74.      From at least January 2018 through at least April 2019, Fouad Baydoun knowingly submitted, and/or caused to be submitted, bills and supporting

documentation that are fraudulent from MML for UDTs performed on patients of Star Pain and NextGen. *See* Ex. 2.

75.    From at least March 2019 through at least March 2020, Fouad Baydoun knowingly submitted, and/or caused to be submitted, bills and supporting documentation that are fraudulent from Future Diagnostic for UDTs performed on patients of Star Pain, NextGen, Heights Pain, Care Recovery and Metro Med. *See* Ex. 3.

### d)    Abdul Baydoun

76.    Abdul Baydoun a/k/a Abe Baydoun is a resident and citizen of the state of Michigan.

77.    Abdul Baydoun is not a licensed physician and holds no medical license in Michigan.

78.    To facilitate the Defendants' scheme, Abdul Baydoun owned or controlled NextGen, which targeted patients who have been in auto accidents and are eligible for No-Fault Benefits.

79.    Through his ownership and/or control of NextGen, Abdul Baydoun directed its activities, including instructing the Physicians to make UDT referrals, thereby facilitating the Predetermined Protocol.

80.    From at least February 2017 through at least March 2018, Abdul Baydoun knowingly submitted, and/or caused to be submitted, bills and supporting

documentation that are fraudulent from Advanced Central Labs for UDTs performed on patients of NextGen. *See* Ex. 1.

81.   From at least January 2018 through at least April 2019, Abdul Baydoun knowingly submitted, and/or caused to be submitted, bills and supporting documentation that are fraudulent from MML for UDTs performed on patients of NextGen.  *See* Ex. 2.

82.   From at least March 2019 through at least March 2020, Abdul Baydoun knowingly submitted, and/or caused to be submitted, bills and supporting documentation that are fraudulent from Future Diagnostic for UDTs performed on patients of NextGen, Care Recovery and Metro Med.  *See* Ex. 3.

### e)   Muna Afan

83.   Muna Afan is a resident and citizen of Michigan.

84.   Afan is not a licensed physician and holds no medical license in Michigan.

85.   To facilitate the Defendants' scheme, Afan owned and managed Star Pain, which targets patients who have been in auto accidents and are eligible for No-Fault Benefits.  In a July 2019 deposition, Khoury, the primary treating physician at Star Pain, testified Afan participated in the day-to-day operations of Star Pain and was at the office every day.

86.     Afan's relationship with Hakki preceded the creation of Star Pain. Specifically, prior to opening Star Pain, Afan was the office manager at Computerised Joint and was the resident agent for Empire Medical Billing, which submitted charges on behalf of Advanced Central Labs, Computerised Joint, and Mini Invasive.  Afan and Hakki also secretly owned a physical therapy practice, Helping Hands Physical Therapy.  Their ownership was revealed in a lawsuit brought by their former partners.  *See Yaldo v. Afan* (2017-002434-CB July 7, 2017).

87.     Through her ownership and/or control of Computerised Joint and Star Pain, Afan directed their activities, including instructing the Physicians to make UDT referrals, thereby facilitating the Predetermined Protocol.

88.     From at least 2016 through at least March 2018, Afan knowingly submitted, and/or caused to be submitted, bills and supporting documentation that are fraudulent from Advanced Central Labs for UDTs performed on patients of the Clinics. *See* Ex. 1.

89.      From at least January 2018 through at least April 2019, Afan knowingly submitted, and/or caused to be submitted, bills and supporting documentation that are fraudulent from MML for UDTs performed on patients of Star Pain.  *See* Ex. 2.

24

90.    From at least March 2019 through at least July 2019, Afan knowingly

submitted, and/or caused to be submitted, bills and supporting documentation that

are fraudulent from Future Diagnostic for UDTs performed on patients of Star Pain.

*See* Ex. 3.

### f)    Anwar Baker

91.    Anwar Baker is a resident and citizen of the state of Michigan.

92.    To facilitate the Defendants' scheme, Baker owned and/or controlled

a network of UDT laboratories in Michigan and Ohio, including Advanced Central

Labs, MML, and Future Diagnostic targeting patients who have been in auto

accidents and are eligible for No-Fault Benefits.

93.    Baker was also the lead toxicologist and ran the tests at Advanced

Central Labs, MML, and Future Diagnostic.  Baker testified that he was the

operation manager at Advanced Central Labs and oversaw the day-to-day

operations, including supervising employees, testing results, recording results,

maintaining the equipment, and performing the validations, calibrations, and daily

maintenance.

94.    Baker owned and/or controlled Advanced Central Labs, MML, and

Future Diagnostic to enrich himself and the other defendants by fully exploiting the

No-Fault insurance environment in Michigan by providing and billing for medically

unnecessary services pursuant to the Predetermined Protocol.

95.    Advanced Central Labs and MML falsely identified Baker as their lab director in correspondence with State Farm Mutual and in litigation.  In fact, Baker's attempt to serve as MML's lab director was denied by the Ohio Department of Health because he did not qualify for the position.  Specifically, on April 12, 2018, MML submitted to the Ohio Department of Health an application for a change in laboratory director, naming Baker as MML's new director.  On April 30, 2018, the Ohio Department of Health rejected this request, explaining that Baker "did not meet the qualifications."

96.    Through his ownership and/or control of Advanced Central Labs, MML and Future Diagnostic, Baker directed their activities, including running the tests and preparing the UDT reports, thereby facilitating the Predetermined Protocol.

97.     From at least 2016 through at least March 2020, Baker knowingly submitted, and/or caused to be submitted, bills and supporting documentation that are fraudulent from:  (a) Advanced Central Labs for UDTs performed on patients of the Clinics, *see* Ex. 1; (b) MML for UDTs performed on patients of Star Pain and NextGen, *see* Ex. 2; and (c) Future Diagnostic for UDTs performed on patients of Star Pain, NextGen and the Baydoun Successor Clinics (Care Recovery, Metro Med and Heights Pain), *see* Ex. 3.

4.      **The Lab Director**

a)      **Mohamed El-Fakharany, M.D.**

98.     El-Fakharany is a resident and citizen of Michigan.

99.     El-Fakharany has been a licensed physician in Michigan since 2005.

100.    Advanced Central Labs identified El-Fakharany as its lab director as part of its CLIA application to perform lab work.  Without a qualified lab director, like El-Fakharany, Advanced Central Labs would not have been able to obtain its CLIA Certificate, which it was required to obtain under federal law before providing the confirmatory UDTs.

5.      **The Physicians**

a)      **Riad George Khoury, M.D.**

101.    Khoury is a resident and citizen of the state of Michigan.

102.    Khoury has been a licensed physician in Michigan since 1977.

103.    Khoury has been the primary treating physician at Star Pain from October 2017 until August 2019.  During this time, the Controlled Labs submitted charges for more than 500 UDTs where he was identified as the referring provider.

104.    From at least November 2017 through the fall of 2019, Khoury knowingly submitted, and/or caused to be submitted, bills and supporting documentation that are fraudulent from Advanced Central Labs and MML for UDTs performed on patients of Star Pain, *see* Exs. 1-2.

### a)   Vinod Sharma, M.D.

105.   Sharma is a resident and citizen of the state of Michigan.

106.   Sharma has been a licensed physician in Michigan since 1986.

107.   Sharma treated patients as a physician at Star Pain from April 2017 until November 2017.  During this time, the Controlled Labs submitted charges for more than 70 UDTs where he was identified as the referring provider.

108.   From at least from April 2017 until November 2017, Sharma knowingly submitted, and/or caused to be submitted, bills and supporting documentation that are fraudulent from Advanced Central Labs for UDTs performed on patients of Star Pain, *see* Ex. 1.

### b)   Horst Griesser, M.D.

109.   Griesser is a resident and citizen of the state of Michigan.

110.   Griesser has been a licensed physician in Michigan since 1997.

111.   Griesser has been the primary treating physician at NextGen from October 2017 until April 2019.  During this time, the Controlled Labs submitted charges for more than 500 UDTs where he was identified as the referring provider.

112.   From at least October 2017 through April 2019, Griesser knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent from Advanced Central Labs, MML, and Future Diagnostic for UDTs performed on patients of NextGen, *see* Exs. 1-3.

28

113.    Beginning in May 2019, Griesser began working out of Care Recovery – which was located in the same building as NextGen.    Griesser was Care Recovery's primary treating physician until November 2019, when he switched over to Metro Med.  Griesser has been the primary treating physician at Metro Med, which Griesser testified has the same owners as Care Recovery and essentially was the direct successor to Care Recovery.

114.    From at least May 2019 through at least May 2020, Griesser – through Care Recovery and then Metro Med – sent virtually all of his patients' UDT referrals to Future Diagnostic.

115.    From at least May 2019 through at least May 2020, Griesser knowingly submitted, and/or caused to be submitted, bills and supporting documentation that are fraudulent from Future Diagnostic for UDTs performed on patients of Care Recovery and Metro Med.  Indeed, during that timeframe, Future Diagnostic's bills list Griesser as the "referring provider" for approximately 140 confirmatory UDTs, which account for over $350,000 of Future Diagnostic's bills submitted to State Farm Mutual.

## IV.    ALLEGATIONS COMMON TO ALL COUNTS

### A.    First-Party Claims for Payment Under The No-Fault Act

116.    Under Michigan's No-Fault Act, insurers are required to pay No-Fault Benefits, including "allowable expenses consisting of all reasonable charges

incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation," MCL § 3107(1)(a), when those benefits are causally connected to an "accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle." MCL § 500.3105.

117.   During the time Advanced Central Labs, MML, and Future Diagnostic were submitting charges to Plaintiff, Michigan required private passenger automobile insurance companies to provide unlimited No-Fault Benefits for life, if all conditions of eligibility were met.

118.   Notably, Khoury testified his approach toward treating patients varied drastically depending on whether those charges would be processed through No-Fault insurance or other payors.  Specifically, in a June 2019 deposition, Khoury testified patients involved in auto accidents, it is a "free for all" and "you could bill anything you want. The sky is the limit . . . ."  In an August 2019 deposition, Khoury confirmed at Star Pain, "attorneys will intercede" to continue treatment, even if Khoury did not believe continued treatment was medically necessary.

119.   For the reasons described herein, the Defendants knew the charges at issue in this complaint were not for reasonably necessary medical services for an injured person's care, recovery, or rehabilitation, and therefore were not owed.

B.    **Third-Party Tort Claims for Non-Economic Loss Under the No-Fault Act**

120.   Under Michigan's No-Fault Act, individuals who are not at fault for the accidents underlying their claims can also potentially recover: (a) non-economic losses, such as for pain and suffering, from the drivers who were at fault for the accident ("At-Fault Drivers") through a claim for bodily injury (a "BI Claim"), only in limited situations, including if the individual has suffered serious impairment of body function, *see* MCL § 500.3135, or (b) if recovery under the BI Claim is insufficient to fully compensate the individuals who are not at fault, from the individual's own insurance company through an uninsured or underinsured motorist claim (a "UM Claim").

121.   An individual suffers serious impairment of body function when his or her general ability to conduct the normal course of his or her life has been affected as a result of an injury.  A determination of whether this occurred requires an analysis of the totality of the circumstances, including:  (a) the nature and extent of the impairment; (b) the type and length of treatment required; (c) the duration of the impairment;  (d) the extent of any residual impairment; (e) the prognosis for eventual recovery; and (f) whether there is "objective manifestation" of the injury.

122.   Defendants' scheme, including the bills and supporting documentation they submitted, and caused to be submitted, to State Farm Mutual were designed to

exploit the patients' No-Fault Benefits and were submitted as part of the BI and UM Claims, thereby inflating the value of potential BI and UM Claims.

### C.   Legitimate Use Of Urine Drug Tests (UDTs)

123.   When patients seek treatment for pain, a licensed professional must obtain a history and perform an examination to arrive at a legitimate diagnosis and, based on that diagnosis, must then engage in medical decision-making to design a legitimate treatment plan tailored to the unique needs of each patient.

124.   Depending on the individual patient's history, physical exam, and diagnosis, the prescription of medication may be appropriate to alleviate pain. However, opioid pain medication presents serious risks, including addiction, overdose, and complications resulting from interactions with other drugs.

125.   UDTs can provide critical information to a medical provider to assess whether drug prescriptions, including opioid prescriptions, are appropriate for a particular patient.  First, UDTs can reveal whether a patient is using either illicit or lawful drugs that the patient has not reported taking to the medical provider, and thus any opioid prescription may be contraindicated until those issues are resolved. This is important because there is an increased risk for overdose when one opioid is combined with another opioid or benzodiazepines, as well as illicit drugs like heroin and cocaine.  Second, UDTs reveal when patients are not taking drugs

prescribed for them, which can indicate the patient is diverting or illegally reselling the drugs prescribed for that patient.

126. Thus, medical providers must ensure red flags detected on UDTs are integrated into the patient's medical care, particularly given the serious risks of opioid usage.

127. There are two types of UDTs typically used by medical providers in a clinical setting, namely a qualitative/presumptive UDT ("presumptive UDT") and a quantitative/confirmatory UDT ("confirmatory UDT"). The presumptive UDT indicates whether a particular drug and/or its metabolites is present in the specimen, but does not indicate the specific concentration of that drug. Thus, results of a presumptive UDT are reported as "positive" or "negative." By contrast, the results of a confirmatory UDT reveal the specific concentration of the metabolites of a particular drug.

128. The Centers for Disease Control published Guidelines for Prescribing Opioids for Chronic Pain ("CDC Guidelines"), which also provide guidance on referrals for UDTs. The CDC Guidelines explain that referrals for confirmatory UDTs should be based on a particular need to detect specific opioids that cannot otherwise be identified on standard presumptive UDTs or in situations where the presumptive UDTs show unexpected results.

129.   The CDC Guidelines advise medical providers "should not test for substances for which results would not affect patient management or for which implications for patient management are unclear."  In addition, medical providers "should have a plan for responding to unexpected results" before ordering any UDTs.

130.   As set forth below, the Physicians not only failed to adhere to the CDC Guidelines, but also even fundamental concepts pertaining to the proper ordering and use of UDTs.  Instead, the Physicians ordered UDTs pursuant to the Predetermined Protocol without engaging in legitimate decision-making and without appropriately documenting or considering the need for the opioids or UDT results.

### D.   Federal Law Governing Laboratories That Perform Confirmatory UDTs

131.   Laboratories that perform tests on specimens from the human body, such as confirmatory UDTs, are regulated by federal law, specifically the Clinical Laboratories Improvement Act of 1967 and the Clinical Laboratory Improvement Amendments, which was enacted in 1988 ("CLIA").  *See* 42 U.S.C. § 263a.  CLIA was enacted to strengthen and improve laboratory testing, thereby protecting the public from poor laboratory services.  Confirmatory UDTs are subject to heightened oversight.

132.   Under CLIA, prior to providing lab services, covered labs, such as the Controlled Labs, are required to receive a CLIA Certificate of Registration.  The application for the CLIA certificate requires prospective labs to identify a lab director, who must meet specific education, training, and experience requirements.

133.   "The laboratory director is responsible for the overall operation and administration of the laboratory, including the employment of personnel who are competent to perform test procedures, and record and report test results promptly, accurately, and proficiently and for assuring compliance with the applicable regulations."  42 C.F.R. § 493.1407.

134.   Section 493.1407 identifies the specific responsibilities the lab director is charged with, which include ensuring, among other things, that:

> (i)   Testing systems developed and used for each of the tests performed in the laboratory provide quality laboratory preanalytic, analytic, and postanalytic phases of testing;
>
> (ii)   Test methodologies selected have the capability of providing the quality of results required for patient care;
>
> (iii)   Verification procedures used are adequate to determine the accuracy, precision, and other pertinent performance characteristics of the method;
>
> (iv)   Laboratory personnel are performing the test methods as required for accurate and reliable results;
>
> (v)   Quality control and quality assessment programs are established and maintained to assure the quality of laboratory services provided and to identify failures in quality as they occur; and

(vi)    All necessary remedial actions are taken and documented whenever significant deviations from the laboratory's established performance specifications are identified, and patient test results are reported only when the system is functioning properly;

42 C.F.R. § 493.1407(e).

135.   Notably, physicians seeking to serve as lab directors are not automatically deemed qualified.  Instead, in addition to being licensed to practice medicine, physicians seeking to serve as lab directors must also:

(1) be certified in anatomic or clinical pathology, or both, by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(2) have laboratory training or experience consisting of:

(A) at least one year directing or supervising non-waived laboratory testing; or

(B) have at least 20 continuing medical education credit hours in laboratory practice commensurate with the director responsibilities defined in Section 493.1407; or

(C) specific laboratory training during medical residency equivalent to at least 20 continuing medical education credit hours in laboratory practice commensurate with the director responsibilities defined in Section 493.1407.

See 42 C.F.R. § 493.1405.

136.   CLIA requires labs to participate several times a year in a proficiency testing program, through which an independent scientific agency sends human tissue samples to the labs for testing.  The labs are then graded on their results.  See 42 U.S.C. § 263a(3).

E.     **The Background And Evolution Of The Scheme**

1.     **Hakki Forms Computerised Joint, Mini Invasive, and Begins Funneling Patients To Advanced Central Labs for UDTs to Maximize His Profits**

137.   The current scheme begins in late 2015, when Computerised Joint, Mini Invasive, and Advanced Central Labs began treating patients in Michigan to exploit their No-Fault Benefits through the referral of hundreds of medically unnecessary UDTs.

138. In November 2015, Hakki incorporated Advanced Central Labs in Florida.  Hakki identified himself and Baker (and two other associates) as managers in the articles of incorporation.  Hakki also guaranteed the bank loan obtained by Advanced Central Labs for $350,000 to jump start its operations and purchase lab equipment.

139. However, in an effort to conceal his ownership and/or control of Advanced Central Labs, Hakki's name was removed from Advanced Central Labs's Florida corporate filings in January 2016.  Rather, Hakki used "Scott Hall" as an alias in the January 2016 submission to the Florida Secretary of State (which also lists his wife, Mona Thamer, as the registered agent).  Hakki's name was omitted altogether from Advanced Central Labs's Michigan corporate filings.

140.   Since it was created until the spring of 2018, Hakki's immediate family members were also involved in Advanced Central Lab's operations.  First, Hakki's

son, David Hakki, designed the website and oversaw billing for Advanced Central Labs.  Hakki's wife, Mona Thamer, was identified as the registered agent in the articles of incorporation for Advanced Central Labs.

141.   Neither Hakki nor Baker were qualified to be lab directors for Advanced Central Labs.  Therefore, in order to obtain the CLIA registration for Advanced Central Labs, Hakki and Baker needed to recruit a qualified person who would allow himself to be listed as the lab director on the CLIA application but would not actually oversee the operations of the lab (since actual oversight likely would have prevented Defendants from implementing the Predetermined Protocol). Defendants were able to recruit El-Fakharany to serve as the nominal lab director. Without his participation, Advanced Central Labs would not have been able to obtain its CLIA certification and would not have been able to submit charges for the confirmatory UDTs.

142. A month after incorporating Advanced Central Labs in Michigan, Hakki started seeing patients involved in automobile accidents at Computerised Joint and Mini Invasive.  The examinations provided by Hakki and other physicians at Computerised Joint and Mini Invasive facilitate the Predetermined Protocol by providing a fraudulent pretext for referring patients for an unnecessary panel of UDTs, which the Physicians never intend to use in guiding treatment decisions.

143.    In February 2016, Advanced Central Labs became operational and Hakki and other physicians working at his direction at Computerised Joint and Mini Invasive began referring patients to Advanced Central Labs for UDTs as a matter of course.   These referrals were made without performing a legitimate medical evaluation and, occasionally, were made without any medical evaluation at all.

144.    Between February 2016 and March 2018, Advanced Central Labs billed a UDT for approximately 80 percent of State Farm insureds who treated at Computerised Joint and Mini Invasive.

145.    Advanced Central Labs purportedly performed both presumptive and confirmatory UDTs for office visits at Computerised Joint and Mini Invasive, even though confirmatory UDTs should not be automatic.   Instead, confirmatory UDTs should reflect an individualized determination of whether the presumptive UDT results require additional "confirmatory" testing and specific quantitative amounts of drugs.   Here, the Physicians, operating under the Predetermined Protocol, did no such individually tailored analysis.   Instead, they routinely ordered both at the same time, solely for the purpose of allowing Advanced Central Labs to submit charges for both.

146.    The referrals for confirmatory testing from Computerised Joint and Mini Invasive also were not limited to testing for drugs the patients were prescribed or at risk of taking.   Instead, Hakki ensured the referrals to Advanced Central Labs

were all for a panel of approximately 20 substances.  In fact, the panels included substances such as alcohol and cotinine (tobacco), which could have no bearing on the treatment plans for patients with soft-tissue injuries, and instead were ordered simply to allow additional billing.

147.  Advanced Central Labs billed individually for each drug tested, totaling more than $3,000 for each date of service, which was grossly excessive.

148.  In sum, these referrals from Computerised Joint and Mini Invasive enabled Advanced Central Labs to submit more than $2 million in charges for UDTs to State Farm Mutual.

149.  Importantly, by design, and because the UDTs were not ordered to guide the clinical care of patients, Hakki and other physicians at Computerised Joint and Mini Invasive did not consider the purported findings of the UDTs or integrate them into the treatment of the patient.  Instead, Hakki and other physicians at Computerised Joint and Mini Invasive routinely ignored red flag results that suggested misuse of illicit or prescription drugs.

150.  In fact, Advanced Central Labs routinely provided the Physicians with UDT reports with physiologically impossible results.  But the Physicians did not acknowledge the physiologically impossible results in their treatment records.

### 2. Hakki Connects The Baydouns And Their Clinics To Advanced Central Labs

151.   During the first year of its operations, Hakki was able to supply Advanced Central Labs with more than 100 patients through his own clinics, enabling Advanced Central Labs to submit more than $1 million in charges to State Farm Mutual alone.  As detailed below, by 2017, Hakki cultivated a relationship with Fouad Baydoun, which enabled Advanced Central Labs to expand its referral base to NextGen and Star Pain, two clinics owned and controlled by cousins Fouad Baydoun and Nabil Baydoun, as well as Abdul Baydoun.  After Hakki connected Fouad Baydoun, Abdul Baydoun, and Nabil Baydoun to Advanced Central Labs, they opened NextGen and Star Pain and implemented the same protocol Hakki implemented at his own clinics.

152.   Specifically, Fouad Baydoun and Hakki began working together no later than May 2016, when they formed Cardinal Management PMS to distribute durable medical equipment ("DME") to Hakki's clinics.   In the articles of incorporation, Fouad Baydoun is identified as a co-manager with the same mailing address as the office of Computerised Joint.  To conceal his ownership and control of Cardinal Management, Hakki used another company he secretly controlled, Property Management Specialist Inc., as the other co-manager.  As with Advanced Central Labs, Hakki used Scott Hall as an alias in Property Management Specialist

Inc.'s submissions to the Florida Secretary of State (which list his wife, Mona Thamer, as the treasurer).

153.   Hakki began referring patients for DME billed by Cardinal Management in June 2016, and referred more than 35 patients to Cardinal Management by the end of 2016.

154.   On January 23, 2017, Hakki and Fouad Baydoun formed MD Spine and Health Center LLC.  To initially conceal his ownership interest, Hakki used Gandy Import & Export LLC as the manager in the 2017 articles of incorporation. In the 2018 filing with the secretary of state, Hakki was identified as the president of MD Spine and Health Center LLC.

155.   Thus, by the beginning of 2017, Hakki and Fouad Baydoun established a history of cooperation, coordination, and even concealment with respect to the operation and management of entities providing goods and services to patients involved in automobile accidents.

156.   Approximately a month after Hakki and Fouad Baydoun further cemented their relationship by forming MD Spine and Health Center LLC, Fouad Baydoun, Nabil Baydoun, and Abdul Baydoun created two "pain management practices," namely NextGen and Star Pain.

157.   As set forth above, the primary treating physicians at NextGen and Star Pain testified Star Pain's and NextGen's patients were all or nearly exclusively all auto accident patients.

158.   The corporate filings falsely described NextGen and Star Pain as providing "rehabilitation services" by "licensed physical therapists."

159.   In forming NextGen and Star Pain, Fouad Baydoun, Nabil Baydoun, and Abdul Baydoun agreed to facilitate the Predetermined Protocol through which NextGen and Star Pain purported to examine patients and referred those patients to Advanced Central Labs for UDTs as a matter of course, without regard to whether the UDT was medically necessary.  Like the referrals from Hakki's own clinics, the protocol implemented by Fouad Baydoun, Nabil Baydoun, and Abdul Baydoun ensured patients were referred for confirmatory UDTs, regardless of the results of the presumptive UDT, and the confirmatory UDT consisted of a panel of 20 or more substances, regardless of the patient's unique circumstances.

160.   Fouad Baydoun, Nabil Baydoun, and Abdul Baydoun are not licensed medical professionals and cannot make referrals for the UDTs themselves so they needed to recruit licensed medical professionals to implement the Predetermined Protocol by making the referrals for UDTs.   Fouad Baydoun, Nabil Baydoun, and Abdul Baydoun recruited several physicians to provide pretextual medical evaluations and UDT referrals at Star Pain and NextGen, including defendants

43

Griesser, Sharma, and Khoury.  Griesser was the primary treating physician at NextGen.  Khoury was the primary treating physician at Star Pain, where Sharma also treated patients.

161.  The physicians recruited by Fouad Baydoun, Nabil Baydoun, and Abdul Baydoun purport to provide legitimate medical evaluations for patients and, based on the evaluations, refer the patients for medically necessary services. However, these evaluations were created to maximize profits and serve as a pretext for referring patients for UDTs at Advanced Central Labs.

162.  In fact, sworn testimony from the Physicians demonstrates the predetermined nature of these UDTs orders, which were established at the behest and direction of laypersons, namely Fouad Baydoun, Nabil Baydoun, Abdul Baydoun, and Afan, and **not** the exercise of independent medical judgment.  In fact, the Physicians testified even before patients are examined, the determination was made to order presumptive and confirmatory tests.  In fact, the Physicians do not even fill out the requisition forms for UDTs.  Instead, when the requisition forms for UDTs are filled out at all, they are filled out by staff at the Clinics.

163.  Moreover, the Controlled Labs performed the full comprehensive panel of tests on each sample automatically, even when the UDT requisition form did not select or specify any panel or tests.  *See*, *e.g.*, Ex. 4, Requisition Forms for Patient A.J.

164.   Khoury and Griesser testified on several occasions that they did not make independent medical decisions to refer patients for UDTs, select the drug panel tests, nor select the UDT lab.  Instead, the UDT referrals were part of an established office protocol that required these physicians to automatically send all patients for confirmatory UDTs.  Consistent with this testimony, the vast majority of patients were billed for a confirmatory UDT.

165.   For example, Dr. Griesser testified, "when I was hired . . . I was told that" NextGen had a policy requiring patients to receive a UDT at each date of service and that it was "the policy of NextGen, not my policy."  Griesser further explained at NextGen, there is a policy that patients "are required every visit to drop urine and then also the urine is sent out" to a lab and "the policies are from Abe [Baydoun]," who also chose the lab.  Greisser also testified that, "[t]he standard of practice through NextGen is they send everything for official review" – confirmatory UDT – "That's the practice of NextGen."

166.   Similarly, Khoury testified that the UDTs at Star Pain were sent "automatically."  When Khoury was asked "Do you use a presumptive and a confirming drug test all the time?" he responded, "Yes. . . .  I don't have control on that. . . ."  Like Griesser, Khoury did not select whether confirmatory testing should be done nor which substances were to be tested for the confirmatory screening.

45

167.   Importantly, like Hakki and the other physicians at Computerised Joint and Mini Invasive, Khoury, Griesser, and the other physicians recruited by the Baydouns did not consider the purported findings of the UDTs nor integrate them into a patient's treatment.   Instead, they routinely ignored both physiologically impossible results *and* red flag results that suggested misuse of illicit or prescription drugs.

168.   The medically unnecessary and unreasonable UDT testing increased Advanced Central Lab's total charges from $1.2 million in 2016 to $4 million in 2017.

### 3.    After Advanced Central Labs Fails Its CLIA Inspection and Is Sued By Allstate, the Management Group Opens MML To Take Over for Advanced Central Labs

169.   Although Defendants successfully implemented the predetermined protocol of referrals to Advanced Central Labs, in the latter half of 2017, Advanced Central Labs came to the attention of both regulators and insurance companies. This unwanted attention prompted the Management Group to open a new lab, MML, to replace Advanced Central Labs, but in a manner designed to conceal that both labs were owned and/or controlled by the same persons.

170.   First, on July 10, 2017, Advanced Central Labs failed its CLIA inspection.   The Michigan Department of Health and Human Services inspected Advanced Central Labs's premises, equipment, instruments, and test systems, in

addition to interviewing employees.  The Department of Health and Human Services found substantial violations, including the failure to perform routine maintenance of its equipment.

171.  At approximately the same time, Advanced Central Labs also failed its proficiency testing—which is required for accreditation—for the second time.  In a proficiency test, the accrediting agency sends the lab a substance for testing, and evaluates the accuracy of the lab's results.  A score of 80% is passing.  After its July 10, 2017 inspection, the Department of Health and Human Services advised Advanced Central Labs that failed its proficiency testing for the second time with a score of 20%.

172.  Shortly thereafter, in November 2017, Allstate Insurance Company filed a civil racketeering and fraud case in the Eastern District Court of Michigan against Hakki, Advanced Central Labs, and several other defendants, *Allstate Insurance Company, et al. v. Hakki, et al.*, Case No. 17-cv-13823 ("Allstate's Advanced Central Labs Lawsuit").  Allstate's Advanced Central Labs Lawsuit alleged, among other things, that Hakki and other physicians who worked for him were engaged in a scheme to defraud Allstate by falsely purporting to legitimately examine and diagnose patients who were eligible for No-Fault Benefits and then refer them for UDTs at Advanced Central Labs for services that either were not performed or were not medically necessary.

173.    As Advanced Central Labs was garnering negative attention, the Management Group decided to open a new lab to take over the operations of Advanced Central Labs, but in a manner designed to conceal that both labs were owned and/or controlled by the same persons.  Thus, two weeks after the failed CLIA Inspection, the Management Group formed MML.  And one month after Allstate's Advanced Central Labs Lawsuit, in December 2017, MML obtained its CLIA registration to provide lab services.

174.    Like Advanced Central Labs, MML was not an independent lab established to provide medically necessary UDTs.  Instead, it was created to assume the same role Advanced Central Labs played:  to maximize profits for the Management Group by submitting charges for medically unnecessary UDTs based on referrals from medical practices owned and/or controlled by members of the Management Group.

175.    Moreover, in an attempt to conceal the true ownership interests and the connections between Advanced Central Labs and MML, the Articles of Organization and other corporate filings submitted to the State of Michigan name only Fouad Baydoun as its "Member" (owner).

176.    However, Advanced Central Labs and MML are both owned and/or controlled by the Management Group.  First, as with Advanced Central Labs, Baker served as the lead toxicologist and ran MML's tests, and his initials typically are on

48

the UDT reports for both labs.  Second, another employee, A.A., worked at both Advanced Central Labs and MML as a receptionist and prepared the samples for testing.  Third, Baker and Owen – who were identified as "Members" (owners) of Advanced Central Labs in its public corporate filings – are identified as the registered agent and organizer of Beckman Ventures LLC, which owns the property at which MML was located.  Fourth, MML's own documentation identified Advanced Central Labs as the service location for some services.  Fifth, MML's "Patient Information Reports" also referred to Advanced Central Labs.  Sixth, the UDT reports and requisition forms for both labs appear nearly identical and, as set forth below, suffer from nearly identical issues and concerns.  Seventh, both labs used the same billing company, Complete Billing Services – which is owned by a person who also served as the registered agent for MML and whose name is listed across the top of NextGen's corporate filings.

177.   On January 2, 2018 – days after MML filed for its CLIA certification – MML entered into a "Laboratory Services Agreement" with Advanced Central Labs, under which MML agreed to pay Advanced Central Labs to perform MML's confirmatory UDTs at Advanced Central Labs' laboratory.  The Agreement is attached hereto as Exhibit 5.  The Agreement provided that Advanced Central Labs will:  (a) "provide laboratory medical and diagnostic testing services on specimens and samples collected by MML"; (b) "manage, conduct and administer the day-to-

day testing operation at its current location . . . 4619 Allen Road, Allen Park, MI";
and (c) "provide the MML Laboratory with laboratory testing results and periodic
reports. . . ."  Ex. 5, Laboratory Services Agreement.  In turn, MML agreed to
"conduct billings" including to the "insurance companies," and "pay [Advanced
Central Labs] monthly payment [to] cover all samples that collected by MML and
run at [Advanced Central Labs]."  *Id.*

178.   In approximately February or March 2018, MML took over the
operations of Advanced Central Labs and began receiving all of the UDT referrals
from Star Pain and NextGen pursuant to the Predetermined Protocol.  Specifically,
as they had done for Advanced Central Labs, the physicians recruited by the
Management Group to work out of NextGen and Star Pain, including Griesser and
Khoury, continued to provide medical evaluations for patients that were not
legitimate.  Instead of legitimately evaluating the patients, these evaluations were
created to maximize profits and serve as a pretext for referring patients for UDTs at
MML.

179.   As they had done with Advanced Central Labs, Khoury, Griesser, and
the other physicians recruited by the Management Group to treat patients at Star
Pain and NextGen did not consider the purported findings of the UDTs or integrate
them into the patient's treatment.  In fact, they routinely ignored both

physiologically impossible results *and* red flag results that suggested misuse of illicit or prescription drugs.

180. Although the purported findings of the UDTs are not considered or integrated by physicians at Star Pain and NextGen, hundreds of patients were referred to MML by Griesser, Khoury, and other physicians at Star Pain and NextGen.

> **4. After MML Is Scrutinized by the Department of Health and its CLIA Certification is Deactivated, the Management Group Opens Yet Another New Lab, Future Diagnostic, To Take Over for MML**

181. Although Defendants successfully implemented the Predetermined Protocol of referrals to MML, in 2018, MML came under scrutiny by the Department of Health. This prompted the Management Group to open yet another new lab, Future Diagnostic, to take the place of MML.

182. On April 12, 2018, MML filed an application for a new CLIA Certificate, in which it provided notification of its new lab director, Anwar Baker. Ex. 6, MML's CLIA Application for Certification, Apr. 12, 2018.

183. MML's application was denied. On April 30, 2018, the Department of Health notified MML but "the laboratory director[, Baker,] did not meet the qualifications" set forth in the CLIA regulations. Ex. 7, Letter from Ohio Department of Health to MML, Apr. 30, 2018.

184.    The Management Group formed Future Diagnostic on July 20, 2018. Future Diagnostic applied for its CLIA Certification in September 2018, obtained its NPI registration in January 2019, and began billing State Farm Mutual for UDTs in March of 2019.

185.    Notably, Future Diagnostic purported to open and perform services at the same address as Advanced Central Labs:  4619 Allen Road, Allen Park, Michigan.

186.    Like Advanced Central Labs and MML, Future Diagnostic was not an independent lab established to provide medically necessary UDTs.  Instead, it was created to assume the same role Advanced Central Labs and MML played:  to maximize profits for the Management Group by submitting charges for medically unnecessary UDTs based on referrals from medical practices owned and/or controlled by members of the Management Group.

187.  In an attempt to conceal the true ownership interests and the connections between MML and Future Diagnostic, only Baker and Mouneer Owen were identified in Future Diagnostic's public corporate filings.

188.    However, MML, Advanced Central Labs, and Future Diagnostic are one and the same and all were owned and/or controlled by the Management Group. First, Baker – the sole person identified on Future Diagnostic's Articles of Organization and identified in its NPI filings as its "Owner" – also was publicly

identified as one of the owners of Advanced Central Labs.  In addition, just as with Advanced Central Labs and MML, Baker served as the toxicologist at Future Diagnostic and his initials are on Future Diagnostic's UDT reports, indicating he ran the tests.  Second, corporate filings identify Owen as a "Member" (owner) for both Future Diagnostic and Advanced Central Labs.  Third, Future Diagnostic was located at Advanced Central Labs' same address.  Fourth, Future Diagnostic used the same telephone numbers as those used by Advanced Central Labs and MML.  Finally, other documentation evidences a connection between the labs, including a Future Diagnostic UDT requisition form that resulted in a UDT report from MML.

189.  In approximately March 2019, Future Diagnostic took over the operations of MML and began receiving all UDT referrals from Star Pain and NextGen pursuant to the Predetermined Protocol.  Specifically, as they had done for Advanced Central Labs and MML, the physicians recruited by the Management Group continued to provide medical evaluations for patients that were not legitimate.  Instead of legitimately evaluating the patients, these evaluations were created to maximize profits and serve as a pretext for referrals of patients for UDTs at Future Diagnostic.

190.  Similarly, after Afan and the Baydouns had a falling out and separated ways and the Baydouns formed their Successor Clinics (Care Recovery, Metro Med, and Heights Pain), the physicians recruited by the Baydouns to work out of

the Successor Clinics, including Griesser, continued to provide medical evaluations for patients that were not legitimate and instead performed to maximize profits and serve as a pretext for referrals of patients for UDTs at Future Diagnostic.

191. On March 5, 2020, Future Diagnostic failed its CLIA inspection. The Michigan Department of Licensing and Regulatory Affairs ("LARA") inspected Future Diagnostic's premises, equipment, instruments, and test systems, in addition to interviewing employees. LARA found substantial violations, including among others, that Future Diagnostic (i) failed "to evaluate quantitative toxicology quality control results before reporting patient results"; (2) admitted that it "did not perform verification of accuracy testing for any toxicology analytes in 2019"; (3) "did not follow . . . quality control acceptance criteria before reporting patient results"; (4) "failed to ensure personnel performing high complexity toxicology testing met educational requirements" and in fact at least one of the testing personnel was "not qualified." Ex. 8, Statement of Deficiencies and Plan of Correction, at 2–3, 11–12, 15, Mar. 5, 2020.

192. As documented in LARA's March 10, 2020 "IMMEDIATE JEOPARDY" letter to Future Diagnostic, LARA "determined that the deficient practices of [Future Diagnostics] pose immediate jeopardy to patient health and safety" which it explained meant that the deficiencies had "already caused, is causing, or is likely to cause . . . serious injury or harm, or death, to individuals

served by the laboratory. . . ." Ex. 9, Letter from LARA to Future Diagnostic, Mar. 10, 2020.  LARA further advised that "[b]ecause of the seriousness of these deficiencies, your laboratory no longer meets the requirements to perform testing under CLIA." *Id.*

193.   On March 23 and again on April 30, 2020, LARA notified Future Diagnostics that the purported evidence of correction it had submitted to LARA "d[id] not constitute a credible allegation of compliance [nor] acceptable evidence of correction" and that if no such evidence was submitted, LARA "will recommend to [CMS] that sanctions be taken against your laboratory's CLIA certificate," including monetary fines and revocation of its CLIA certificate.  Ex. 10, Letter from LARA to Future Diagnostic, Mar. 23, 2020; Letter from LARA to Future Diagnostic, Apr. 30, 2020.

194.   Shortly thereafter – beginning in May 2020 – the Baydoun Successor Clinics (Metro Med and Heights Pain) began sending their UDT referrals to a new lab, iNova.

195.   As with the other labs, in an attempt to conceal the true ownership interests and connections between the earlier labs and iNova, the public corporate filings and NPI filings name only "Jenna Zardus" as its "Owner" – a 22-year-old. However, iNova's lab director recently testified under oath that iNova is in fact owned by Frank Baydoun and Nabil Baydoun.

### F.   Defendants' Fraudulent Referrals For UDTs

196.   As noted above, when ordered in a legitimate setting, UDTs can provide information to a medical provider that is critical in assessing whether opioid drug use is appropriate for a particular patient.  First, UDTs can reveal that a patient is using either illicit or lawful drugs the patient has not reported to the medical provider.  Second, UDTs can reveal when patients are not taking opioids prescribed for them, which can indicate the patient is diverting or illegally reselling the opioids.  Both would be "red flags" that should be addressed and integrated into the patient's treatment plan.

197.   Given the numerous risks to patients (and others) that flow from the prescriptions of opioids, medical providers prescribing these medications must ensure adequate compliance and rule out contraindications through responsible, medically necessary UDT testing that (1) appropriately tests for important substances, (2) with the correct tests, (3) with appropriate frequency, and (4) considers the results of the tests with respect to patient care and safety.

198.   By contrast, the Physicians here order UDTs not because they are clinically indicated for the patient or because they intend to use the results to make legitimate medical decisions for the patients.  In fact, the Physicians: (1) order UDTs as a matter of course, at almost all dates of service; (2) order presumptive and confirmatory UDTs simultaneously, with no individualized determination of

the need or nature of any confirmatory UDTs; (3) order an unjustifiably extensive panel for the confirmatory UDTs; (4) routinely ignore "red flag" results that could implicate patient safety and care; and (5) routinely ignore physiologically impossible UDT results.

        **a)**      **Defendants Refer Patients For UDTs As A Matter Of Course To Maximize Profits**

199.  Although UDTs can provide relevant information to a medical provider assessing whether a patient is abusing or misusing prescription drugs, UDTs are not medically necessary for all patients.  To determine whether a patient needs an initial UDT or repeat UDTs, a provider must consider the patient's unique medical history and engage in medical decision-making to determine whether a UDT is medically necessary on a particular visit.  These considerations include, but are not limited to, whether the patient has a history of abusing prescription drugs or whether the patient is being prescribed drugs, such as narcotics, that pose serious risks of overdose resulting from interactions with other drugs.

200.  By contrast, as noted above, the Physicians admitted in deposition testimony the UDTs were supposed to be ordered at each office visit, without any consideration of the patient's unique needs and circumstances, such as whether the patient was being prescribed opioids, whether the patient had any indications of being at risk for addiction, or whether the patient's prior UDTs indicated the patient was misusing prescription medications.

201.   In short, as a consequence of this mandated protocol, the Physicians ordered UDTs, regardless of whether the patient was taking or being prescribed opioids.  Moreover, the Physicians continued to order additional UDTs at almost every subsequent visit, regardless of whether the results of the prior UDTs suggested the patient was misusing prescription or illicit drugs.  Tellingly, the medical records are silent why a UDT was ordered for any particular patient.

202.   For example, Patient C.V. treated at Computerised Joint from February 2016 until April 2016.  During this time, Patient C.V. was not prescribed narcotics at Computerised Joint.  Nonetheless, Hakki referred him for three confirmatory UDTs.  None of the medical records from Computerised Joint provide any indication why extensive UDTs would be medically warranted.

203.   Similarly, Patient M.B. – a patient of Dr. Khoury at Star Pain – received six confirmatory UDTs in 2018, although he was not being prescribed narcotics.  When confronted with these referrals, Dr. Khoury conceded M.B. was not prescribed any narcotics.  Khoury further admitted under oath that none of these UDTs were medically necessary, stating that those UDTs "should not be done at all."  Ex. 11, Khoury Dep., 44:7–45:7, Mar. 28, 2019.

204.   This type of predetermined automatic ordering of UDTs demonstrates the Physicians were not performing individualized medical decision-making based on each patient's unique needs.

### b) Defendants Order Presumptive And Confirmatory UDTs Simultaneously To Maximize Profits

205.   As described above, it is not medically appropriate to automatically refer patients for confirmatory UDTs.  According to the CDC Guidelines, referrals for confirmatory UDTs should not be routine.  Instead, the confirmatory UDTs should be based on a particular need to detect specific opioids that cannot otherwise be identified on standard presumptive UDTs or in situations where the presumptive UDTs show unexpected results.

206.   By contrast, the Physicians referred patients for confirmatory UDTs as a matter of course, simultaneously ordering presumptive UDTs and confirmatory UDTs at most dates of service.  There was no medical basis for automatically referring patients for confirmatory UDTs.  Moreover, the Defendants' practice of automatically ordering confirmatory UDTs highlights the Physicians never intended to rely on the results of the presumptive UDTs.

207.   In fact, the presumptive UDTs for numerous patients revealed negative results for all of the substances being tested, indicating there was no need to obtain confirmatory UDTs.  Nonetheless, the Physicians routinely ordered confirmatory UDTs when the presumptive UDTs were completely negative.

208.   Tellingly, in addition to failing to indicate why a UDT was being ordered, the Physicians did not provide any explanation of *why* a confirmatory UDT was being ordered.  In fact, although patients typically received both a presumptive

59

UDT and a confirmatory UDT, the Physicians often did not even document they ordered both a presumptive UDT and a confirmatory UDT.

209.   This type of predetermined automatic ordering of confirmatory tests in the absence of any clinical rationale, demonstrates the Physicians are not performing individualized medical decision-making based on each patient's unique needs.

### c)   Defendants Order Unreasonably Extensive Confirmatory Panels To Maximize Profits

210.   A patient's unique history and needs may warrant a referral for a confirmatory UDT on a particular visit (such as when presumptive UDTs show unexpected results for a patient with a history of substance abuse disorder).   A confirmatory UDT can test for a single or multiple substances, depending on the instructions from the referring provider.   In a legitimate setting, after concluding confirmatory testing is appropriate, the medical provider could select a subset of substances that should receive the more robust testing.

211.   By contrast, the Physicians almost always ordered extensive panels for the confirmatory UDTs, regardless of the patient's unique circumstances (such as the results of the presumptive UDTs).   These extensive panels typically tested for more than 20 substances, including nicotine and alcohol, which could have no bearing on the treatment plans for patients with soft-tissue injuries.

212.   The selection of the extensive panel was not made because it was medically necessary for the patient.   Instead, Defendants ensured patients were referred for these extensive panels to maximize profits because the Controlled Labs billed separately for each substance tested.   When the charge for each drug is added up, the final charge from the Controlled Lab is $3,000-4,000 for each date of service.

213.   For example, Patient A.J. self-reported to Star Pain that he used tobacco.   However, Star Pain ordered, and ACL performed, drug testing for Cotinine (an alkaloid found in tobacco and metabolite of nicotine).   Moreover, Star Pain made no comment nor altered any treatment due to the positive Cotinine UDT result.

### d)   Defendants Ignore Physiologically Impossible UDT Results

214.   Because the Physicians did not order the UDTs for any medically necessary reason, they ignored results in the confirmatory UDT reports, including numerous UDT reports with physiologically impossible results.   Specifically, confirmatory UDTs identify the specific concentration of the metabolites of a particular drug.   Patients cannot have a negative amount (*i.e.*, less than 0) of a particular drug in their system.   If a person is not using that drug, the lowest

concentration is "0."  In other words, although a patient can test "negative" for a substance, it is impossible to have a negative ***amount*** of a substance.

215.   Although it is physiologically impossible for patients to have a negative amount (*i.e.*, less than 0) of a particular drug in their system, numerous UDT reports from the Controlled Labs listed negative amounts of a particular metabolite.

216.   In a legitimate setting, a medical provider seeing physiologically impossible results in the UDT reports should be alarmed because the presence of scientifically impossible and invalid results undermines the accuracy of the UDT report.  In a legitimate setting, a medical provider seeing that a lab was consistently sending UDT reports with physiologically impossible results would address the issue and reconsider referring patients to a lab where the results lacked validity.

217.   By contrast, because they never intended to rely on the UDT reports, the Physicians never acknowledged these physiologically impossible results. Instead, they continued to refer patients for UDTs to the Controlled Labs.  In fact, ***more than 100 patients*** had physiologically impossible results included in their UDT reports – all without comment from the Physicians.  *See* Ex. 12, Examples of UDT Reports With Physiologically Impossible Results.

218.   For example, the February 6, 2017 UDT report from Advanced Central Labs indicated Patient S.J. had -1.3 ng/ml of fluoxetine and -1.1 ng/ml of marijuana

and.  Similarly, the UDT report from March 6, 2017, also included numerous physiologically impossible results.  Hakki ignored all of the physiologically impossible results.  Ex. 12, Patient S.J. Drug Adherence Assessment Report, Feb. 6, 2017.

219.   Patient Z.O. was treated by Khoury at Star Pain from November 2017 until April 2018.  During that time, Khoury referred her for five confirmatory UDTs, four of which included physiologically impossible results.  Khoury did not acknowledge any of the physiologically impossible results, and instead, continued to make referrals to the Controlled Labs.  Ex. 12, Patient Z.O. Drug Adherence Assessment Reports.

220.   Patient R.H. was treated by Griesser and other physicians working at NextGen from October 2017 until September 2019.  During that time, NextGen sent her for six confirmatory UDTs, at least two of which included physiologically impossible results.  Griesser did not acknowledge any of the physiologically impossible results, and instead, continued to make referrals to the Controlled Labs.  Griesser also did not acknowledge that Patient R.B. tested positive for Oxycodone, a narcotic, and Fluoxetine, a benzodiazepine, even though the combination of a narcotic and a benzodiazepine poses notable risks to patient safety.  Ex. 12, Patient R.H. Drug Adherence Assessment Reports.

221.   Patient D.B. was treated by Griesser and other physicians working at NextGen from August 2017 until at least April 2019.   During his treatment, NextGen sent him for at least 20 confirmatory UDTs, at least five (5) of which included physiologically impossible results.   Griesser did not acknowledge any of the physiologically impossible results, and instead, continued to make referrals to the Controlled Labs and prescribe Percocet (oxycodone) to Patient D.B.   Ex. 12, Patient D.B. Drug Adherence Assessment Reports.

### e)   Defendants Ignore Red Flags That Could Implicate Patient Care And Safety

222.   In addition to ignoring physiologically impossible results, the Physicians did not consider or integrate the results of the UDTs into the patient's treatment.   Such analysis would be especially important for patients with red flags in their UDT reports, *e.g.* patients who tested negative for prescribed medications, or patients who tested positive for illicit drugs or drugs that were not prescribed; because these results could indicate serious contraindications for continued opioid prescriptions and could jeopardize patient safety, including the safety of others if the test results suggest the patient may be diverting or even selling prescribed opioids to individuals not under medical care.

223.   Numerous patients who received UDTs had at least one UDT result that suggested the patient was: (1) not taking the medication being prescribed, (2) taking medication that was not prescribed; and/or (3) was taking an illicit substance.

Yet, the Physicians almost never note these patients had any unexpected UDT results, much less analyze and document the significance of the unexpected UDT result, which is important in determining whether the patients should continue receiving additional medication.

224. For example, Patient S.J. was treated by Hakki from November 2016 until May 2017, during which time Hakki sent eight referrals to Advanced Central Labs for her. Although Hakki's records indicated only a prescription for hydrocodone, Patient S.J.'s January 12, 2017 UDT report indicated she was positive for: (1) zolpidem (which is sold as Ambien); (2) tramadol; and (3) hydrocodone. Ex. 13, Patient S.J. Drug Adherence Assessment Report, Jan. 12, 2017; Ex. 13, *see also* Patient S.J. Prescription for Norco, Dec. 6, 2016. Combining zolpidem and hydrocodone can have serious health risks because both cause respiratory depression. Despite the risks to the patient, Hakki ignored this result at patient S.J.'s next office visit on February 6, 2017 but ordered another UDT at Advanced Central Labs. Ex. 13, Patient S.J. Encounter - Office Visit, Feb. 6, 2017. Although Hakki only noted a prescription for Hydrocodone during the office visit, Patient S.J.'s February 6, 2017 confirmatory UDT report was positive for *four* separate narcotics: (1) Oxycodone; (2) Tramadol; (3) Hydrocodone; and (4) Fentanyl. Ex. 13, Patient S.J. Drug Adherence Assessment Report, Feb. 6, 2017. Combining these narcotics can have serious health risks. Despite the risks to the patient, Hakki ignored this

result at patient S.J.'s next office visit on February 22, 2017. Ex. 13, Patient S.J. Encounter - Office Visit, Feb. 22, 2017 (making no comments on inconsistent UDT results).

225. Patient A.H. treated at Star Pain between May 2017 and April 2018, during which time she was referred to the Controlled Labs by the Physicians for a Confirmatory UDT on at least eleven occasions (out of twelve visits). Although several of Patient A.H.'s confirmatory UDT reports included red flags and physiologically impossible results, the Physicians did not acknowledge these. *See*, *e.g.*, Ex. 14, Patient A.H. UDT Reports, May 6, 2017, May 25, 2017, June 3, 2017, June 28, 2017, Aug. 1, 2017, Aug. 31, 2017 (all containing several negative measured results, which are physiologically impossible). For example, Patient A.H.'s June 28, 2017 Confirmatory UDT report indicated she was positive for alpha-hydroxytriazolam (a benzodiazepine), buprenorphine (an opioid used to treat pain as well as addiction to narcotics), and oxymorphone (a metabolite of oxycodone), which she was not prescribed. Ex. 14, Patient A.H. UDT Report, June 28, 2017. It also included numerous physiologically impossible results. *Id.* (listing, *e.g.*, Fentanyl as -28 and amphetamines as -4.2). At Patient A.H.'s next office visit on August 1, 2017, Sharma did not acknowledge the red flag or physiologically impossible results but instead just "[c]ontinue[d] . . . [the] Norco" prescription and

ordered another confirmatory UDT.  Ex. 14, Patient A.H. Follow-Up Visit, Aug. 1, 2017.

226.   Patient S.H. was treated by Khoury at Star Pain from October 2018 to April 2019 and then by Griesser at Care Recovery from May 2019 to October 2019. During that time, Khoury referred Patient S.H. for at least 5 confirmatory UDTs at MML and then Future Diagnostic, and Griesser referred S.H. for at least 7 confirmatory UDTs at Future Diagnostic.  During the course of treatment, Khoury and Griesser ignored repeated red flag UDT results.  For example, the January 9, 2019 UDT report from MML indicated that Patient S.H. had oxycodone, hydrocodone, and Alprazolam (a benzodiazepine).  Ex. 15, Patient S.H. UDT Report, Jan. 9, 2019.   However, Khoury had prescribed only hydrocodone at the preceding exam on December 7, 2018.  Ex. 15, Patient S.H. Exam Report, Dec. 7, 2018.  Subsequent UDT reports from MML – from February 11 and March 12, 2019 – and then from Future Diagnostic – dated April 12, May 9, May 31, June 18, July 23, September 23, and October 31, 2019 – also indicated that Patient S.H. tested positive for hydrocodone, as well as Alprazolam (a benzodiazepine).  Ex. 15. Those results are inconsistent because neither Khoury nor Griesser had prescribed any benzodiazepines.  In addition, taking opioids and benzodiazepines concurrently can increase the risk of overdose.  Khoury, however, failed to even acknowledge the inconsistent UDT results in his exam reports, and though Griesser noted in some

exam reports that the "UDS [was] positive for BZO [benzodiazepine] and OPI [opioid]," he took no actions to address the dangerous inconsistencies. *Id.* Neither Khoury nor Griesser made any indication they counseled Patient S.H. on the risks of consuming opioids and other opioids, or benzodiazepines and opioids, together. Instead, both Khoury and Griesser just continued to prescribe hydrocodone and order additional confirmatory UDTs from the Controlled Labs. *Id.*

227.   Patient L.E. was treated by Griesser at NextGen for more than a year. During that time, Griesser referred Patient L.E. for at least 13 presumptive and 13 confirmatory UDTs, first at Advanced Central Labs and then at MML, once it took over the operations of Advanced Central Labs. During the course of Patient L.E.'s treatment, Griesser repeatedly ignored red flags and physiologically impossible results. For example, although Griesser did not prescribe hydrocodone until April 2018, Patient L.E. tested positive for it on February 1, 2018, March 5, 2018, and March 28, 2018. Ex. 16, Patient L.E. UDT Reports, Feb. 1, 2018, Mar. 5, 2018, Mar. 28, 2018. In fact, on March 28, 2018, Patient L.E. tested positive for Flexeril, morphine, and hydrocodone, none of which were prescribed by Griesser at the preceding office visit. *See id.* The March 28, 2018 UDT report from MML also a physiologically impossible result. *See id.* At the following office visit, Griesser did not acknowledge either that the UDT report had a physiologically impossible result or that Patient L.E. was routinely testing positive for prescription drugs

Griesser had not prescribed.  Ex. 16, Patient L.E. Exam Report, Apr. 24, 2018. Instead, despite the three prior inconsistent UDT results, Griesser just prescribed L.E. hydrocodone.  *Id.* Meanwhile, Patient L.E.'s May 24, 2018 UDT at MML indicated he did not have hydrocodone in his system (which Griesser had prescribed) but did have fentanyl and nortriptyline in his system (which Griesser did not prescribe).  Ex. 16, Patient L.E. UDT Report, May 24, 2018.  At Patient L.E.'s next evaluation on June 28, 2018, Griesser did not acknowledge this discrepancy in the exam report.  He noted instead "UDS POSITIVE FOR THC AND OPI," which is not consistent with the UDT report from MML, and just continued to prescribe hydrocodone.  Ex. 16, Patient L.E. Exam Report, June 28, 2018.

228.   Patient A.J. was also treated by Griesser at NextGen and then at Care Recovery for nearly two years.  During that time, Griesser referred Patient A.J. for at least 16 confirmatory UDTs:  two at Advanced Central Labs, eight at MML, and then six at Future Diagnostic.  During the course of Patient A.J.'s treatment, Griesser repeatedly ignored red flag inconsistencies in A.J.'s UDT results.  These include two (2) UDT results that indicated that Patient A.J. was taking drugs (such as fentanyl, morphine and codeine) that Griesser had not prescribed to him, and later several UDT results that indicated that Patient A.J. may not have been taking the hydrocodone Griesser prescribed for him.  Ex. 14, Patient A.H. UDT Reports,

Feb.6, 2018, Mar. 6, 2018 (positive for drugs not prescribed); Patient A.H. UDT Reports, Feb. 21, 2018, May 16, 2018, June 16, 2018, July 23, 2018, Aug. 30, 2018 (negative for all drugs, including prescribed hydrocodone). Each of these UDT results should have been addressed and integrated into A.J.'s treatment plan. However, Griesser failed to acknowledge any of these inconsistent UDT results in his exam reports and just continued to prescribe Norco at each exam.

229.   Similarly, Patient W.D. was also treated by Griesser at NextGen for more than a year. During that time, Griesser referred Patient W.D. for at least 16 confirmatory UDTs, first at Advanced Central Labs and then at MML. During the course of Patient W.D.'s treatment, Griesser ignored red flags and/or physiologically impossible results on numerous dates of service.

230.   As another example, Patient D.B. was also treated by Griesser at NextGen and then at Care Recovery for more than two years. During that time, Griesser referred Patient D.B. for more than 20 confirmatory UDTs, first at Advanced Central Labs, then at MML, and then at Future Diagnostic. During the course of Patient D.B.'s treatment, Griesser ignored red flags and/or physiologically impossible results on numerous dates of service.

> f)   **Defendants' Duplicative Billing For Presumptive UDTs**

231.   To further maximize profits, Star Pain and NextGen began submitting charges for presumptive UDTs that were already billed by Advanced Central Labs and then MML, once it took over the operations for Advanced Central Labs in 2018.

232.   Between 2016 and 2019, Advanced Central Labs and MML submitted charges for presumptive UDTs for hundreds of patients.  As described above, the results of presumptive UDTs were not factored into either the treatment of the patient or determining whether a confirmatory UDT was medically necessary.  Instead, regardless of the results of the presumptive UDTs, the specimen was sent automatically for a confirmatory UDT.

233.   During this same time period, Star Pain and Next Gen also submitted charges for presumptive UDTs for more than 100 patients, which were also charged by the Controlled Labs.

234.   For example, Patient A.S. treated at Star Pain from October 2017 until March 2018.  During that time period, Star Pain referred Patient A.S. to Advanced Central Labs or MML four times.   On each of these occasions, Advanced Central Labs or MML submitted charges for presumptive UDTs and confirmatory UDTs. Star Pain also submitted duplicative charges for presumptive UDTs on each of the four dates of service.

## G.      State Farm Mutual's Justifiable Reliance

235.   Defendants submitted, and caused to be submitted, medical records and bills falsely representing the Controlled Labs provided services that were medically necessary when, in fact, they were not.

236.  State Farm Mutual is under statutory and contractual duties to promptly pay No-Fault Benefits for medically necessary services.  The bills and supporting documents Defendants submitted, and caused to be submitted, to State Farm Mutual in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm Mutual to justifiably rely on them.

237.   Defendants made material misrepresentations and have taken other affirmative acts to conceal their fraud from State Farm Mutual.  Each bill and its supporting documentation, when viewed in isolation, do not reveal their fraudulent nature.  Only when the bills and supporting documentation are viewed together as a whole and over time, do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation.

238.   As a result, State Farm Mutual has incurred damages of more than $1 million in No-Fault Benefits paid to Defendants.

## V.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF 18 U.S.C. § 1962(c)
### <u>(Against All Defendants)</u>

239.   State Farm Mutual incorporates, adopts, and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1-238 above.

240.   All defendants formed an association-in-fact "enterprise" (the "UDT Fraudulent Billing Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engaged in, and the activities of which affected, interstate commerce.

241.   The members of the UDT Fraudulent Billing Enterprise were joined in a common purpose, had relationships with and among each other, and associated through time sufficient to permit those associated to pursue the enterprise's common purpose, which was to defraud State Farm Mutual and other insurers through fraudulent claims for No-Fault Benefits.

242.   Each defendant needed and depended upon the participation of the other defendants to accomplish their common purpose of defrauding State Farm Mutual and other insurers through fraudulent claims for No-Fault Benefits. Specifically,

(a) the Management Group members are the primary drivers of the fraud scheme and implemented the Predetermined Protocol through their ownership or control of the Clinics and Controlled Labs;

(b) the Physicians, including Griesser, Sharma and Khoury, falsely purported to perform legitimate examinations and to prescribe UDTs

73

because they were medically necessary, when, in fact, their examinations were not legitimate and these services were prescribed to maximize profits for the Controlled Labs;

(c) the Clinics and Controlled Labs served as the entities through which the Defendants purportedly performed the above-described services and submitted, and caused to be submitted, to State Farm Mutual the bills and supporting documentation for these services; and

(d) the Lab Director allowed the Controlled Labs to use his name on their CLIA applications in order to obtain their license to perform lab testing, although he never intended to and did not oversee the operations of the lab or ensure the tests are reliable and accurate.

243.   The participation and roles of each defendant were necessary to the success of the scheme.  None of these defendants were capable of carrying out the scheme without the participation of the others.

244.   Each defendant has been employed by and/or associated with the UDT Fraudulent Billing Enterprise.

245.   Each Defendant has knowingly conducted and/or participated, directly or indirectly, in the conduct of the UDT Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit to State Farm Mutual and other insurers hundreds of fraudulent claims for services that were medically unnecessary or were not performed, which are described in the RICO Events on Exhibits 1-3 attached hereto.  Sample treatment records are attached hereto as Exhibits 13-18.  The false statements of material fact include that:

(a) the Physicians referred patients for UDTs because they were medically necessary to address the unique needs of each patient, when, in fact, they did not;

(b) the UDTs were performed because they were medically necessary, when in fact, they were not.

246. By reason of the above-described conduct, State Farm Mutual has been injured in its business and property in that it has paid more than $1 million to Defendants based upon the fraudulent charges.

WHEREFORE, State Farm Mutual demands judgment against Defendants, compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

## SECOND CAUSE OF ACTION
## VIOLATION OF 18 U.S.C. § 1962(d)
## (Against All Defendants)

247. State Farm Mutual incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1-238 above.

248. Defendants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the UDT Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of

the United States mail to submit to State Farm Mutual and other insurers hundreds of fraudulent claims for services which were medically unnecessary or were not performed.

249.    The charts attached hereto as Exhibits 1-3 summarize bills Defendants submitted, and caused to be submitted, to State Farm Mutual in furtherance of their mail fraud scheme.

250.    Defendants agreed to and acted in furtherance of the common and overall objective of the conspiracy, to defraud State Farm Mutual and other insurers, through the roles and conduct described in Paragraphs 240-246 above.

251.    By reason of the above-described conduct, State Farm Mutual has been injured in its business and property in that it has paid more than $1 million to Defendants based upon the fraudulent charges.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
### COMMON LAW FRAUD
### <u>(Against All Defendants)</u>

252.    State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1- 238 above.

253.   Defendants intentionally and knowingly made or caused to be made false and fraudulent statements of material fact to State Farm Mutual by submitting, and causing to be submitted, thousands of bills and related documentation for services that were either not performed, or were not performed because they were medically necessary to address the unique needs of patients.

254.   The false statements of material fact include that:

(a) the Physicians referred patients for UDTs because they were medically necessary to address the unique needs of each patient, when, in fact, they did not;

(b) the UDTs were performed because they were medically necessary, when in fact, they were not.

255.   Defendants knew the above-described misrepresentations made to State Farm Mutual were false and fraudulent when they were made.

256.   Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual to rely on the misrepresentations.

257.   As a result of its justifiable reliance on these misrepresentations, State Farm Mutual has incurred damages of more than $1 million in No-Fault Benefits paid to Defendants.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just and proper.

## FOURTH CAUSE OF ACTION
## UNJUST ENRICHMENT
### (Against All Defendants)

258.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1-238 above.

259.   State Farm Mutual conferred a benefit upon Defendants by paying their claims and Defendants voluntarily accepted and retained the benefit of those payments.

260.   Because Defendants knowingly submitted, and caused to be submitted, to State Farm Mutual bills and supporting documentation for services that were not performed or were not performed because they were medically necessary, circumstances are such that it would be unjust and inequitable to allow them to retain the benefit of the monies paid.

261.   As a direct and proximate result of the above-described conduct, State Farm Mutual has been damaged and Defendants have been unjustly enriched by more than $1 million.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just and proper.

### FIFTH CAUSE OF ACTION
### DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201
### (<u>Against the Controlled Labs</u>)

262.    State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-238 above.

263.    This action is for declaratory relief pursuant to 28 U.S.C. § 2201.

264.    There is an actual case and controversy between State Farm Mutual, on one hand, and Advanced Central Labs, on the other hand, as to all charges for UDTs ordered by the Physicians that have not been paid.  State Farm Mutual contends Advanced Central Labs is not entitled to be paid for any of these unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

265.    There is an actual case and controversy between State Farm Mutual, on one hand, and MML, on the other hand, as to all charges for UDTs ordered by the Physicians that have not been paid.  State Farm Mutual contends MML is not entitled to be paid for any of these unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

266.   There is an actual case and controversy between State Farm Mutual, on one hand, and Future Diagnostic, on the other hand, as to all charges for UDTs ordered by the Physicians that have not been paid.  State Farm Mutual contends Future Diagnostic is not entitled to be paid for any of these unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

267. Because the Controlled Labs have knowingly made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim that each of them has submitted to State Farm Mutual, they are not entitled to any reimbursement for any unpaid claims and charges for services performed pursuant to the Predetermined Protocol submitted to State Farm Mutual to date and through the trial of this case.

WHEREFORE, State Farm Mutual respectfully requests a judgment declaring that the Controlled Labs are not entitled to reimbursement for any of the unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

State Farm Mutual also respectfully seeks supplementary relief, attorneys' fees, interest, and costs, as this Court deems equitable, just, and proper.

80

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual demands a trial by jury.

Dated:  August 20, 2021

Respectfully submitted,

By:  */s/ Ross O. Silverman*
Ross O. Silverman (IL 6226560)
Eric T. Gortner
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street, Suite 1900
Chicago, IL  60661-3693
(312) 902-5200
ross.silverman@kattenlaw.com
eric.gortner@kattenlaw.com

Thomas W. Cranmer (P25252)
Matthew P. Allen (P57914)
Caroline B. Giordano (P76658)
MILLER, CANFIELD, PADDOCK
   And STONE, P.L.C.
840 W. Long Lake Road, Suite 150
Troy, MI 48098
(248) 267-3381
cranmer@millercanfield.com
allen@millercanfield.com
giordano@millercanfield.com

*Attorneys for Plaintiff State Farm*
*Mutual Automobile Insurance Company*